## Case No. 13,957.

### THOMPSON et al. v. HAIGHT et al.

[1 U. S. Law J. 563.]

Circuit Court, S. D. New York. 1826.

PATENTS—FOR WHAT GRANTED—INVENTOR—USE—USEFULNESS—NOVELTY.

An invention or improvement, to be the subject of a patent, under the act of Congress, passed in 1793 [1 Stat. 318], entitled "An act to promote the progress of the useful arts," must be both new and useful; and it is not enough, that the person claiming to be an inventor, is really the author of the invention or improvement, but he must assert his claim to this character, and sue out his patent, while the invention is yet recent, and before it has come into general use; and the thing invented, or the improvement, must be substantially useful, and not a mere contrivance, without any other merit than that of novelty.

This case was summed up with much learning and ability, by T. A. Emmet and Daniel Robert, for the complainants, and by J. O. Hoffman and George Griffin, for the defendants, after a long and patient trial, that consumed several days, from the great number of witnesses examined, and the various points of law collaterally involved in the controversy. [See Case No. 13,956.] We do not deem a summary of the evidence requisite. We think the opinion explains itself.

VAN NESS, District Judge. The patent in question is dated on the 12th day of August, 1820. The specification annexed, is in these words: "This invention or improvement, in the composition, or making, or manufacturing, of ingrained carpets or carpeting, consists in making the warp thereof, that is, the threads that extend lengthways of the same, of cotton, flaxen tow, or hempen yarn or thread, and weaving or combining them therewith, in the manner of weaving carpets or carpeting; the filling, that is, the threads that extend crossways, to consist of woolen or worsted yarn, by the weaving or combination of which materials, in the manner of weaving carpets, or carpeting, of any figures or colours, can be made or manufactured." On the 17th day of February last, the complainant, by his counsel, moved this court for a rule that the patentees show cause why process should not issue against them to repeal the above patent. The application was founded, and the rule granted, upon affidavits alleging that the patent in question had been obtained surreptitiously, or upon false suggestion; and this allegation, supported by other evidence, tending to show that the manufacture, for the ex-

clusive working and making of which the respondents had obtained the patent, was not new, or, in other words, that they were not the true inventors or discoverers. The rule was granted, and in compliance with a decision which had been made in another case, after full argument and deliberation, the parties upon the hearing went into the whole merits of the case, and the alleged originality of the manufacture in question was investigated with much labour and assiduity.

The general novelty of the questions involved in this case has produced some difficulties in its investigation, and the pecuniary value ascribed to the exclusive privilege claimed by the respondents imparts to it an unusual degree of interest and delicacy. Not only are the questions now before me novel, but the whole law relating to patents may still, in this country, be regarded in that light. The "Act to promote the progress of useful arts," has seldom been the subject of judicial examination or exposition. Some suits, it is true, have, at different times, been brought under the fifth and sixth sections; but they have not been numerous, nor can we derive from their reported progress and results much aid in our present inquiries. Even in England the law of patents has, until recently, remained in much obscurity. It is a circumstance worthy of remark, and difficult to explain, that, although the law regulating the granting of patents has been established, as it now stands, ever since the reign of James I., yet, with one exception only, there is no case reported in the books prior to the 25th year of George III. It is too evident, however, that the privileges already obtained and daily acquired under this act will furnish fruitful sources of future litigation. The seeds of controversy are already sown in every quarter of the country. The very great and very alarming facility with which patents are procured is producing evils of great magnitude. It encourages the flagitious peculations of imposters, and the arrogant pretensions of vain and fraudulent projectors. Interfering patents are constantly presented to our observation, and patentees are everywhere in conflict. Amidst this strife and collision, the community suffers under the most diversified extortions. Exactions and frauds. in all the forms which rapacity can suggest, are daily imposed and practised under the pretence of some legal sanction. The most frivolous and useless alterations in articles in common use are denominated improvements, and made pretexts for increasing their prices. while all complaint and remonstrance are effectually resisted by an exhibition of the great seal. Implements and utensils, as old as the civilization of man, are daily, by means of some ingenious artifice, converted into subjects for patents. If they have usually been made straight, some man of genius will have them made

crooked, and, in the phraseology of the privileged order, will swear out a patent. If, from time immemorial, their form has been circular, some distinguished artizan will make them triangular, and he will swear out a patent, relying upon combinations among themselves, and that love of novelty which pervades the human race, and is the besetting sin of our own people, to exclude the old and introduce the new article into use, with an enhanced price for the pretended improvement. Impositions of this sort, are of common occurrence, and will continue to multiply while the door to imposture is left open and unguarded. More than three thousand patents have been granted since the year 1790. The number obtained for the same or similar objects is well worthy of observation. Eighty are for improvements on the steam engine and on steam boats; more than a hundred for different modes of manufacturing nails; from sixty to seventy for washing machines; from forty to fifty for threshing machines; sixty for pumps; fifty for churns; and a still greater number for stoves. The demand for this article has called forth much ingenuity and competition. There are now not less than sixty patents for stoves, pretended to be constructed upon different principles. Some are patented, as it is called, because they have ten plates; some, because they have eleven; some, because the smoke is permitted to escape at one side, and some because it is let out at the other. Some indefatigable projectors have contrived them with a door on each side, and others, still more acute and profound, make them with a door on one side. But all must be compensated, in the price of the article, for the time, labour, and learning, employed in making their several improvements. All are men of genius; and surely, genius, in a new and enterprising country, must be rewarded! The contribution levied upon the community, in the sale of these articles, is enormous, and would be sufficient to satisfy the most inordinate avarice, if it were not distributed among so many men of merit. With great justice many men of genuine skill and true genius complain that they are robbed of their lawful and legitimate rewards, by constant and incessant encroachments upon their rights. They are, indeed, often made the victims of itinerant pretenders, who traverse the country with a view to examine new inventions, and by some cunning device evade the patents that protect them. Sometimes the introduction or subtraction of a wheel, or some other frivolous alteration, is made. to satisfy their conscience in testifying to the novelty of their contrivance, and then they issue forth, with their parchment and great seal, in the redoubtable character of patentees and discoverers of some great and useful improvement in the arts. The consequences always are, litigation and endless trouble, if not

total ruin, to the true inventor. These evils are accumulating apace, and will soon, it is hoped, attract the attention of the legislature. The system that produces them must be bad. Some mode should be devised of examining into the novelty and utility of alleged inventions, before patents are issued to the applicants. This was directed to be done by the first act of congress, passed relative to this subject; but, unfortunately, I think, it is not required by that now in force. In England, as I have shewn in another place, this investigation generally is, and always may be, instituted. But there, another very effectual, though not, perhaps, a very commendable, security exists, against frivolous applications for patents. It is the very great expense attending the proceedings necessary to obtain them. It amounts to above six hundred dollars,— a sum, which, added to the hazard of a failure, would seem sufficient to deter all but very sturdy impostors from making experiments upon the credulity of the government. In France, in an early stage of the Revolution, a law was enacted for the encouragement of artists and new inventions. The general principles of the English system were adopted as the basis of the act; but, in the spirit of innovation and change which then prevailed, this pernicious modification was introduced, which opened the door to impostures, and patents, as here, were gratuitously issued to all who sought them. The evils, however, inherent in such a system were soon perceived, and for many years past no patent has been issued but upon due examination into the alleged importance of the subject.

A more rigid scrutiny than is made into the merits of pretended inventions is recommended by every consideration of prudence and safety. It is due to the comfort and peace of every organized community that such a protection should be incorporated into every system devised for the encouragement of individual enterprize. It has been said, and often repeated, that the abuse of a privilege is no argument against the privilege itself. I think it is. I think the liability of a privilege to abuse is always a fair argument against granting it. But, in this enlightened age, I trust, few, if any, will be found to deny the propriety and equity of granting to ingenious men the exclusive use of their inventions or discoveries for a reasonable time. It is not that exercise of the legislative power of the country of which I am disposed to complain. It is not the great principle upon which the act is founded, but the means adopted to effectuate its purposes, which I think reprehensible. The security and benefits to which the inventors of valuable improvements are entitled can never be adequate to their merits, while patents are issued without inquiry, without limitation or restraint. They should only be granted, as I conceive, upon due examination into the merits of the application, and then the rights granted should be well secured, and well protected. The present regulations frustrate and defeat the great principle and design of the act. If it were necessary to fortify or support this position by a reference to facts or experience of any sort, we have both in abundance before us. It is unnecessary to look farther than to see the fate of Whitney, Evans, and above all, Fulton, or those who represent him. Instead of deriving peace, honour, and affluence from their incessant labour and incomparable skill, they have sunk under vexation and the pressure of litigation. Patent upon patent and privilege upon privilege have been granted, infringing the original rights, until their hopes and anticipated rewards were converted into despair and poverty. In the degrading conflict, even the laurels they had fairly won withered amidst the wreck of their fame and their fortunes.

If means are not devised and adopted to arrest this torrent of fraud and imposition, engendered and invited by the present system of granting patents, it will be in vain we look to the great principles of the statute of James, or to any other barriers against the growth and introduction of all the evils that distinguished the ancient system of monopolies. The exclusive privileges authorized by that statute and our own are but modifications of the monopolies and grants by which the people of every quarter of the globe have, for ages, been oppressed. Under some form or other, their existence may be traced far back into antiquity,—to all times and all countries to which the researches of the historian have extended. In various ways and for different purposes, they were practised or enforced, by individuals or societies, to the injury or oppression of the public. Their deleterious influence often pervaded the body politic, and was manifested in the depression of individual enterprize, and the extinction of public spirit. It sullied, at times, the purity of the church, contaminated the morality of the philosopher, and corrupted the integrity of the magistrate. The right to authorize them was, however, at a very early period, claimed as an attribute of sovereignty; and, until a different example was furnished by the statute of James, was held to be inherent in the regal office. But these pernicious expedients for increasing the revenue, or replenishing the exhausted coffers of the crown, were never employed in the extent to which they were pushed by the immediate predecessor of James I. Elizabeth lavished them, with a munificent hand, upon her courtiers and her servants, whether distinguished by her personal favour or for their public services. All trade and commerce, whether foreign or domestic, was appropriated by monopolists. Industry and the arts languished alike, under these unnatural restraints and fictitious embarrassments. Emulation was extinguished, and individual enterprize sunk under such various and multiplied oppres-

sions. Notwithstanding the renown and external glory of this reign, the nation was oppressed and miserable. The masculine and heroic temper of the sovereign, united to the vigour and genius of her military councils gave victory to her arms, and added laurels to her crown, but brought ruin to her people. The legitimate resources and revenues of the government were dilapidated and exhausted, while the sale and gratuitous distribution of monopolies were relied on to supply the munificence and relieve the necessities of the crown. This abuse of the prerogative at length exhausted the patience of the people and awakened a spirit of resistance, which ultimately produced the statute of James.

With the passing of this act terminates the political history of monopolies or patents. This statute effected an important and salutary change in the prerogative rights of the British crown. As has already been observed, notwithstanding some vague claims of the parliament, and the occasional decisions of the courts, the king had immemorially exercised a supreme and unlimited control over both the foreign and domestic trade of the nation; and on that foundation rested the whole multitude of exclusive privileges which had been granted to powerful associations or mercenary individuals. This statute abolished all that were deemed unjust or oppressive, and provided an effectual remedy against the recurrence of similar evils, for it left the crown only the naked right to grant to ingenious men the exclusive use of their own inventions or discoveries for a limited period. The nature and extent of the restriction thus imposed upon the prerogative of the king will appear more distinctly by referring to the received and established definition of a monopoly, or patent, prior and subsequent to the statute,—the one by Lord Coke, and the other by Hawkins. "A monopoly," says Coke, "is an institution or allowance by the king, by his grant, commission, or otherwise, to any person or persons, bodies politic or corporate, of or for the sole buying, selling, making, working, or using of any thing, whereby any person or persons, bodies politic or corporate, are sought to be restrained of any freedom or liberty that they had before, or hindered in their lawful trade." After the statute of James was passed, Hawkins defined a monopoly thus: "A monopoly is an allowance by the king, to any person, for the sole making, selling, &c., any thing so that no person be restrained in what he had before, or in using his lawful trade." There would seem to be an inaccuracy here. The saving of the statute only goes to the working and making. The selling remains under the general prohibition, as will be seen under the fifth and sixth sections of the act. The first definition states it to be a grant in derogation of the general freedom of trade, and of rights at the time enjoyed by the public. The second defines it to be a grant of a privilege, which neither abridges any right nor restrains any privilege previously possessed or enjoyed. This latter definition is founded on the sixth section of the statute, which exhibits the only remaining remnant of the ancient prerogative applicable to this subject. The provisions of this act, and this definition of the grants it authorizes, confirm and establish the great principle that the right of the people to the practise of any known and useful art is not to be abridged, by the grants of the crown, and that they are not thus to be restrained in the enjoyment of anything in common use. The only power remaining in the crown, in respect to monopolies or patents, is to grant privileges "for fourteen years or under for the working, or making, of any manner of new manufacture, within the realm, to the true and first inventor or inventors of such manufacture, which others, at the time of making such letters and grants, shall not use, so that they be not contrary to the law, nor mischievous to the state."

It is this power in the British crown, as it existed and was understood at the time of the adoption of the constitution of the United States, which by that instrument is conceived to be vested in congress. The constitution of the United States declares that "the congress shall have power to promote the progress of science and useful arts, by securing, for limited terms, to authors and inventors, the exclusive right to their respective writings and discoveries." The legislature has, accordingly, in the act of 1793 [1 Stat. 318], entitled "An act to promote the progress of useful arts," adopted the fundamental principles, if not the details, of the English system. That act provides "that when any person or persons, being a citizen or citizens of the United States, shall allege that he or they have invented any new or useful art, machine, manufacture or composition of matter, not known or used before the application, and shall present a petition to the secretary of state, signifying a desire of obtaining an exclusive property in the same, and praying that a patent may be granted therefor, it shall and may be lawful for the said secretary of state, to cause letters patent to be made out in the name of the United States," &c., "granting to such petitioner or petitioners, his, her, or their heirs, administrators, or assigns, for a term not exceeding fourteen years, the full and exclusive right and liberty of making, constructing, using, and vending to others to be used, the said invention or discovery," &c. The British statute leaves to the crown the right to grant letters patent for "the sole working or making of any manner of new manufactures, to the true and first inventor." That of the United States authorizes letters patent to be issued to any person who has invented "any new or useful art, machine, manufacture, or composition of mat-

ter, not known or used, before the application." These clauses are, respectively, the foundation upon which the law of patents rests in the two countries; and, although their phraseology differs, they are in substance the same. There is a great coincidence in these fundamental provisions of the two acts: "Any manner of new manufacture" is equivalent to "any new or useful art, machine, manufacture, or composition of matter." The judicial expositions, therefore, of each will be mainly applicable to the other.

In England, within the last forty years, questions upon patents have frequently arisen, and have drawn from their courts, in some important cases, very able expositions of the system they have erected upon the statute of James. Wherever, therefore, the two systems coincide, and where the circumstances of the cases are similar, we may derive important aid, in the application of our own law, from the luminous decisions of the British courts. The part of our statute, or, rather, of the clause I have just recited, which first presents itself for consideration, is the term "new." The "art, machine, manufacture, or composition of matter," for which a patent is claimed, must be "new." In relation to this point, the British statute has received a construction, which, with great respect, seems to me to be at variance with its whole scope and object, and is not justified, in my judgment, by any rules of construction applicable to the English language. It has been decided that a manufacture brought from abroad, if new in England, is a new manufacture, within the meaning of the statute. The words are, "The sole working or making any manner of new manufactures within the realm;" not manufactures, new within the realm, but, as I conceive, new manufactures, worked and made within the realm. The working and making must be within the realm, and the manufactures new,—new everywhere. For what sort of new manufacture is that which is known the world over, though not yet introduced in England? What sort of new machine is it, that has been in use for centuries in a neighboring kingdom? And what sort of an inventor is he, who makes a trip from Dover to Calais to get it? But he must be an inventor; for the statute allows patents to issue only to the "true and first inventors." A patentee, therefore, must be an inventor, and he must swear to it, too, to bring himself within the act, or the king will withhold the grant. The received construction, then, of the statute of James, appears to me, to involve gross absurdities, and to be a palpable perversion of the terms and plain meaning of the act. It is a departure from its spirit, and defeats its avowed object. It is everywhere said that this prerogative power was left in the crown, for the purpose of rewarding the personal merit of ingenious men,— to stimulate their inventive powers. But this alleged object of the act is at war with

its practical application, and places the plagiarist and original inventor upon the same footing. This construction is given to the statute in the case of Edgeberry v. Stephens, [2 Salk. 446], the first reported decision upon the statute of James, and has its origin, I am constrained to believe, in the policy of the government. Expediency and the policy of the state have, no doubt, contributed to uphold it. It has been uniformly adhered to, and is everywhere laid down as established law; but I have nowhere seen it supported, as the true and grammatical construction of the language of the act. The policy may be good. It is not that I mean to condemn. But it ought to have been authorized and supported by a legislative provision, and not founded on a judicial perversion of the language of the law. From the 21st James to the time when the case of Edgeberry v. Stephens was decided, there is no judicial exposition of the statute on record. How it was understood and executed during that long interval is not known, nor is there any reported case from that of Edgeberry v. Stephens to the 25th of George III., in which this clause of the statute is expounded, or which throws any light upon the general law of patents.

Our own statute is not liable to the ambiguity upon which I have remarked. It allows patent monopolies to those who have invented "any new and useful art, machine, manufacture or composition of matter, not known or used before the application." This clause of the act of 1793 is plain and explicit. It is not obscured by any artificial arrangement of words, generating doubts to be resolved by policy or expediency. The art, &c., must be new; not new in one place, and old in another; but new, both at home and abroad. A patent cannot be obtained here for a manufacture known and practiced in a foreign country. A patentee must be an inventor, not an inporter. The patent must be for the result of his own ingenuity, not for a stolen or borrowed product. If even the act of 1793 left room for a doubt, which it does not, that of 1800 would remove it. That act very clearly develops the policy of the legislature. Its provisions, and the oath it prescribes, show, too obviously to admit of doubt or misconception, that it did not mean, in any case, to grant patents or monopolies for imported novelties, but to leave their introduction to the enterprize of the public. At the argument of this cause, one of the counsel proposed to contend that it was immaterial whether the alleged improvement of the defendants was known or used in England, or not. I could not but admire the adventurous and enterprizing spirit that prompted the effort; and while I express my respect for his high and singular endowments, must be allowed to regret that he estimated mine so low as to hazard the suggestion.

While, therefore, in England, it is deemed enough if the manufacture, for which a pat-

ent is claimed, be new "within the realm," here, I hold it most clear, that the art, &c., must be absolutely new. Although this word seems sufficiently to indicate and establish the meaning of either statute, yet the legislatures of both countries, from abundant caution, have gone farther and declared,—the one, that the manufacture must not only be new, but such as "others, at the time of making such letters patent, and grants, shall not use;" the other, that the art, &c., must be "not known or used before the application" for a patent. Although the phraseology of these clauses is somewhat different, yet the meaning of them seems to me to be precisely the same; and the coincidence is sufficiently clear and close to render the expositions of the one useful in elucidating the other. Whatever may be its grammatical sense and true meaning, it will readily be perceived that this clause of the statute of James must be construed in subordination to the judicial decisions of the English courts, which proceed on the ground that the statute refers to manufactures new "within the realm." The "use," therefore, must have been "within the realm," or it will not vitiate the grant. Thus understood, the law is applied and enforced with great rigor. The utmost caution and secrecy is necessary on the part of inventors; for any knowledge or use of their discoveries by others, previous to the sealing of their patents, will avoid them. It is unnecessary to cite authorities in support of this doctrine. It follows necessarily from the very letter of the statute. It pervades the whole law of patents, and every case reported in the books. It is fundamental in the British system, and, with great deference, I think it is so in our own. I hold, in what I conceive to be the plain and explicit language of the statute, that the invention or discovery for which a patent is claimed must not have been "known or used before the application," and if it were, that the patent, if obtained, would be void. I have reflected maturely on this branch of the subject, and, as the opinion I have formed differs widely from those which have been expressed by other judges, for whose experience, sound judgment, and valuable attainments I entertain a very high and very sincere respect, it becomes me to state the reasons upon which it is founded.

It must be admitted that the clauses of the British and American statutes, which I have quoted, are expressed in synonymous terms, and, as far as they are allowed to operate, their construction and effect must be the same. But, it is said, in an "Essay on the Law of Patents, &c.," a late American work, that "there is a difference between our statute and that of Great Britain on this subject. In England, if the invention has been put in use before the patent is obtained, it is void. But our act does not, like the English statute, refer to the grant of letters patent, but to the time of the invention." Fess. Pat. 50. I should have been utterly unable to ascertain from what part of the act this doctrine has been drawn, if the author had not, at the same time, stated that "the terms of the first section ought to be construed with reference and in subordination to the sixth section." I cannot acquiesce in this construction of the statute. It is, as I conceive, in direct conflict with the fundamental principles of the system which the legislature intended to establish, and subversive of great public rights, which congress has no authority under the constitution, to abridge. The first section of the act of 1793 develops, in plain and unambiguous terms, the principles of the law, and the manner in which the legislature proposed to lend its assistance and authority to promote the progress of useful arts. It authorizes letters patent to issue to any citizen or citizens of the United States who shall allege that he or they have invented any new and useful art, &c., "not known or used before the application." If the invention be neither new nor useful, or if it be known, or in use, at the time the application is made, the patent cannot lawfully issue, and, if issued, would be void; for it must be conceded that the statute gives the power to repeal or annul an illegal patent.

The words "not known or used before the application" form no part of the necessary allegations in the petition. They are directory to the department from which the patent must issue, and explanatory of what shall be deemed a new art, &c., viz. that it be not known or used at the time the petition is presented. The petitioner alleges that the art, &c., is new, and the department shall receive the allegation as true, if the art, &c., be not known or in use. If it be, the allegation is false, and the patent must be withheld. The act does in no way refer to the time of the invention, but most obviously to the time of making the application. In the common, if not in the critical, sense of the term, the petitioner may be an inventor, and a true inventor, but the inventor of an old, not a new, art. To entitle him, however, to a patent, he must have invented something which is new when he makes his application; and a new art I trust, will be admitted to be a new thing. He may have invented something that was new at the time of the invention, but which has become old and known before he applies for a patent. For such an art, or thing, no patent can issue. It is not alone his merit as an inventor which entitles a patentee to his grant. He is supposed to possess information which, if known, would be publicly beneficial, and, for disclosing it, he is rewarded with a monopoly. That disclosure forms the inducement to the grant, and the foundation on which it rests. If he has already imparted his knowledge gratuitously, or lost the exclusive possession of it negligently, he has no longer any thing new and useful to communicate, and, in either case, is not entitled to a patent. It is a precedent condition that he add something to the

stock of existing knowledge. The third section is conclusive on this subject. It declares, not only that the inventor, before he can receive a patent, shall swear that he is a true inventor, but shall furnish a written description of his invention, "in such full, clear, and exact terms, as to distinguish the same from all other things before known,"—known before the granting of the patent, as is evident from the subsequent requisition of the section. Why else require the description of the invention to be so plain as to "enable any person skilled in the art," &c., "to make, compound, and use the same." And in the case of a machine, the inventor "shall fully explain the principle, and the several modes in which he has contemplated the application of that principle or character, by which it may be distinguished from other inventions." And he shall deliver a model of his machine, if required, and "accompany the whole with drawings and written references, when the nature of the case admits thereof." And when the invention is a composition of matter, he shall furnish "specimens of the ingredients, and of the composition of matter, sufficient in quantity for the purpose of experiment." If the act does not "refer to the time of the grant of the letters patent, but to the time of the invention," how are all these explanations and descriptions necessary? Surely they are not required to enable a skilful person to practice an art already known and in use, or to make a machine which may be seen on the highway, or to distinguish the invention from all others known half a century before, for that is a period within the inventive life of man. How is it to be ascertained what was known 30, 40, or 50 years ago? There may be some rational grounds on which to determine the novelty of an invention, at the time when the patent is granted, but very inadequate means, if any, to judge of its novelty at the remote period which may be specified by a fraudulent applicant.

Under the construction I am resisting, a man may have a patent for an invention or discovery made at any period of his life, no matter how long or how publicly it has been known or used. Every thing which has been introduced into use, within the period assigned to the continuance of human life, may now be patented. But the statute does not require, nor does it admit of, a construction so absurd, and one which involves consequences so pernicious to the state. Our system of patent law was undoubtedly meant to be erected upon the great principles of the British statute. That statute professed to be declaratory of the common law, and it could not have been intended to revive, here, doctrines repudiated and denounced by both; doctrines, which had, in that country, oppressed the industry and extinguished the enterprize of the people; which had been proclaimed throughout the land as of the essence of despotism, and had been resisted to

the very verge of insurrection. Their abandonment was extorted from the crown by the indignant spirit of the British parliament, and the statute of James stands upon its records as a great and lasting monument of the victory achieved by the recuperative energy of the nation. I cannot admit, that these principles have been transferred to our system. They do not I think, lurk under any of the provisions of our act, and they are not to be resuscitated and regenerated by construction. I do not hesitate to negative every part of the law relative to this branch of the subject, as laid down in the work to which I have referred. I contend that there is no "difference between our statute and that of Great Britain on this subject." That here, as in England, "if the invention has been put in use, before the patent is obtained, the patent is void." That our act does, like the English statute, "refer to the time of the grant of the letters patent, and not to the time of invention." That the terms of the first section ought not to be construed "with reference, and in subordination to, the sixth section." The first section, as I have already remarked, lays down, plainly and explicitly, the principles upon which the legislature meant to proceed, and forms the basis of the superstructure which has been erected. The loose provisions, inartificial phrases, and vague expressions, that may be found in subsequent sections, must be construed in reference to the first. It is there we see the scope and spirit of the law; and by that provisions otherwise doubtful must be tested.

If the act of 1793 admits of doubt, it is explained, and the construction I contend for established, by the act of 1800. By that act, aliens, who have resided two years within the United States, are entitled to all "the rights given to citizens of the United States, respecting patents for new inventions, by the act of 1793, and they shall enjoy the privilege, granted thereby, in as full and ample manner as citizens." The oath prescribed to them is that the art or discovery, for which they ask a patent, "hath not, to his or her knowledge, or belief, been known, or used, either in this, or any foreign country." That this knowledge or use is intended to "refer to the grant of the letters patent," and not "to the time of the invention," is demonstrated by the next provision, which declares "that every patent which shall be obtained," &c., "for any invention," &c., "which it shall afterwards appear, had been known, or used, previous to such application for a patent, shall be utterly void." Now, if, in the one case, the "knowledge and use refer to the time of the invention," and in the other to the "time of the grant of the letters patent," aliens and citizens are not on the same, but on a very different footing; and the express object of the act of 1800 [2 Stat. 37], would thus be totally defeated. But I see no unsuperable incongruity in the act of 1793. The fifth section of that act, or,

rather, the third of the act of 1800, and sixth of the act of 1793, give the patentee a remedy for the infringement of his patent, by an action on the case, and allow the defendant to protect himself, by showing, among other things, "that the thing thus secured by patent was not originally discovered by the patentee, but had been in use, or had been described in some public work, anterior to the supposed discovery of the patentee." In either case judgment shall be rendered for the defendant, and the patent declared void. It is these clauses, which are said to be in conflict with the principles of the first section. But, under the first section, the patentee must be an original discoverer, or inventor; and in this respect the two sections coincide. The date of the discovery must be determined by the date of the patent; for the discovery must have been new, and not used, when the patent was issued. That is the date the patentee has, himself, affixed to his discovery, by his own allegation, when applying for his patent, under the first section, and he cannot be permitted to falsify it under this. How else can the date of the discovery be ascertained? The patentee may have had some vague and undefined notion of a new thing floating in his imagination, through half his life, and fix the consummation of his scheme at any and at various periods, suited to his interest. But that is not the evidence which the law requires. He may show, it is said, that he reduced his speculation to practice, and use, anterior to the date of the patent. Then, he shows too much. Then, by his own shewing, by the common law, and by the controlling principles of our own, his patent, as I contend, is void. It was obtained surreptitiously and upon false suggestion. It was bad, in its origin, under the first section, and cannot be good under this. A patent could only be rightfully granted to him for a thing, at the time, not known or used. If, then, the defendant shows, and, in my judgment, it is all he can be required to show, that the thing secured by the patent was in use, or had been described in some public work, anterior to the date of the patent, he shows that it was so anterior to the supposed discovery of the patentee; for the discovery must be supposed coetaneous with the patent. This construction of the sixth section, in which I have entire confidence, reconciles its provisions with the general principles of the act, and steers clear of the constitutional objections to which the other is exposed. Even if the construction I have adopted be wrong, yet this section does not control the terms of the first section, nor the principles upon which a patent may be repealed, upon a scire facias. Although it should receive the opposite construction, and the date of the patent should not be adopted as the date of the invention, yet that will prevail only in actions for damages, in the circuit court. It must be confined to proceedings under that section, and can, in no way justify the exposition of the general law, adopted in the "Essay on the Law of Patents."

If the construction of the patent law, which I have opposed, had been incidental, merely, I should not have given it so much attention. But, it pervades the work, and professes to derive support from the decision in the case of Evans v. Weiss [Case No. 4,-572], in the circuit court for the Third circuit. With all my habitual respect for the great experience and profound discernment of the judge who presides in that court, I feel it my duty, while the subject is open for discussion, to express my dissent from some of the positions assumed, and some of the principles maintained, in that case. That the construction, given to the proviso in the "Act for the Relief of Oliver Evans" [6 Stat. 70], was correct, is most readily admitted. It was rational, and required by the terms of the law. But, as I most respectfully conceive, the act itself was a nullity. Evans possessed, at the time, no right which could be secured under the constitution. The right he once had was lost. It had become public property. And, I maintain, with confidence, the broad principle that the congress had no authority to grant a monopoly of a thing which is known, and in common use. It is, then, publici juris, and the enjoyment of it can never again be made exclusive, in the hands of an individual. When this law was passed, Evans' patent had been declared void, under the sixth section of the act of 1793, which forever put an end to the monopoly. For, whether the inventor gratuitously throws open his invention to the public, or whether it becomes known by other means; whether the patent expires by its own limitation, or is declared void by judgment of law,—is perfectly immaterial. In either case, no second patent can issue. The invention is then the property of the public, and of that the legislature cannot grant a monopoly. Though a first or original inventor has a right, if you please, to the exclusive enjoyment of the product of his own labour and ingenuity, he can only enjoy it thus while he keeps it as his own, and in his own exclusive possession. His ideas and intellectual operations, and all the enjoyments that attend them are his own, while withheld from the world; but, if he proclaim them, they enter into the mass of public knowledge, and cannot be withdrawn. The individual and secret knowledge of the petitioner, when he applies for his patent, belongs exclusively to himself; and it is the beneficial and public application and use of it which the legislature is authorized to secure to him for limited time. But, instead of securing to him his own, the legislature has no right to give to him what has become the property of others. It cannot deprive the public of what it possesses, to give it to an individual. It cannot prohibit the people

from the use and application of their own knowledge to any beneficial purpose, or from the practice of any art, useful to themselves, and not injurious to the state. Knowledge, diffused, is as common to the use and enjoyment of mankind as the atmosphere in which we live and move. It can never happen, then, as decided in the case to which I have referred, that "a man, after he shall have gone to the expense of erecting a machine, for which the inventor has not, then, and never may, obtain a patent, shall be prevented from using it, by the grant of a subsequent patent, and its relation back to the patentee's prior invention." A patent can have no relation back. It is very true that "the right to a patent belongs to him who is the first inventor, even before the patent is granted." That is, none but the first inventor can have a patent. But neither he, nor another, can have a patent, if the invention be in use. It cannot, in that case, be patented at all. So that he "who, knowing that another is the inventor, yet doubting whether that other will ever apply for a patent, proceeds to construct a machine," cannot "be cut out of the use of the machine, thus erected, by a subsequent patent." Id. If he knows how to construct it, he may make it, and use it, and can never be obstructed in the exercise of the right he has thus acquired. Neither individuals nor the public can suffer if "an obstinate or negligent inventor should decline obtaining a patent, and, at the same time, keep others at arm's length, so as to prevent them from profiting by the invention, for a length of time." Id. An effort, like that, would be wholly unavailing and fruitless. An inventor possesses no such right, and there exists no power to confer it upon him.

The principles maintained, in the case of Evans v. Weiss [supra], go the whole length of affirming that any art now practiced, and any machine, now in use, may be withdrawn from the enjoyment of the public by the original inventor. If that be so, we are thrown back to the situation of the people of England, prior to the statute of James. We are daily exposed to a revival of all the monopolies which were terminated by that act, and of all the evils which led to their suppression. I cannot accede to an exposition of the law, or a construction of the constitution, involving so direct an invasion of the inherent and indefeasible rights of the people. Evans' patent, having been annulled in due course of law, the invention or improvement for which it was granted had passed into common and general use. Congress possessed no right or power to make it private property again by authorizing the department to issue another patent to the inventor. Even the parliament of Great Britain, with all its undefined powers, and vague claims to political omnipotence, had never attempted to exercise an authority so destructive to the industry of the nation, and so subversive of public freedom. It sometimes extends the duration of the patent beyond the fourteen years to which it must be limited by the crown. But this is always done before its expiration. For then the invention is still private property. It remains so as long as the patent endures. While it continues private, its exclusive use may be prolonged. Perhaps congress possesses a similar power, though even that may be doubted. But its power over the subject expires with the patent.

The construction of the sixth section of the act of 1793 has given rise to much discussion, on other occasions and in other places; but, whatever difference of opinion may prevail, I cannot doubt that its phraseology was inadvertently adopted, and without intending to control the leading principles of the first section. I have, perhaps, devoted more time to the consideration of this section than, at first view, may appear necessary. But it must be recollected that a principal point, in this case is that the manufacture, for which the patent is granted, is not new. It becomes necessary, therefore, in order to decide it understandingly, to ascertain, as far as is practicable, the legal import of the term. While on the subject of the sixth section, I must be permitted to remark, without stopping long to illustrate the observation, that the provision which requires the defendant to prove that the specification was left deficient, or made redundant, for the purpose of deceiving the public, is pernicious in its practical operation, and at war with all the principles on which, alone, a patent or monopoly can or ought to be granted. Exclusive privileges, as we are taught, are conferred as a reward to the patentee for communicating something new and useful to the public. If he does not communicate it, so that it can be understood, what matters it whether the concealment or addition be the result of fraud or negligence? In either case the public receives no equivalent for the benefit conferred upon him. What he has invented or discovered, it is fair to presume he can describe intelligently; and defects in the specification should in all cases avoid the patent. How is the design to be proved? It seldom, if ever, can; and the public may often times, after much wealth has been accumulated by the individual and the patent expired, be left as ignorant as before it was granted.

It has been seen, plainly, I think, that the subject of a patent must be both "new" and "not known or used, before the application." It must also be "useful." This term has been defined to mean such an invention as is "not frivolous, or injurious to the well being, good policy, or sound morals of society" (Lowell v. Lewis [Case No. 8,568]); such an invention "as may be applied to some beneficial use in society in contradistinction to an invention which is injurious to the morals, the health, or the good order of so-

ciety" (Bedford v. Hunt [Id. 1,217]). A more enlarged and comprehensive signification may safely and properly be ascribed to the term "useful." It may well be added, that it must be an art, &c., not mischievous to the state, or generally inconvenient, which brings it within the terms of the British statute. It seems to me to have been used and intended as equivalent to that clause in the sixth section of the statute of James, which defines the nature of the new manufactures which will be exempted from the general prohibition of the act. What, if I may be allowed the phraseology, can be less useful than a patent that interrupts the practice of an art, &c., commonly known? What more pernicious to the state than the monopoly of a machine or manufacture already in use? I should not hesitate to decide, under this expression in the act, if the point were presented, that such an art, &c., or such a machine or manufacture, were not patentable, and that the grant was void. As this case, in my view of it, does not turn on this point, it is not necessary to pursue its investigation further.